# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 8, 2022         Decided August 12, 2022

No. 21-5166

LOPER BRIGHT ENTERPRISES, INC., ET AL.,
APPELLANTS

CAPE TRAWLERS, INC., ET AL.,
APPELLEES

v.

GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY
OF COMMERCE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00466)

*Eric R. Bolinder* argued the cause for appellants. With him on the briefs was *Ryan P. Mulvey*.

*Daniel Halainen*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Todd Kim*, Assistant Attorney General, and *Rachel Heron*, Attorney.

Before: SRINIVASAN[*], *Chief Judge*, ROGERS and WALKER, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* WALKER.

ROGERS, *Circuit Judge*: In implementing an Omnibus Amendment that establishes industry-funded monitoring programs in New England fishery management plans, the National Marine Fisheries Service promulgated a rule that required industry to fund at-sea monitoring programs. A group of commercial herring fishing companies contend that the statute does not specify that industry may be required to bear such costs and that the process by which the Service approved the Omnibus Amendment and promulgated the Final Rule was improper. We affirm the district court's grant of summary judgment to the Service based on its reasonable interpretation of its authority and its adoption of the Amendment and the Rule through a process that afforded the requisite notice and opportunity to comment.

**I.**

The Magnuson-Stevens Fishery Conservation and Management Act of 1976 (the "Act"), 16 U.S.C. §§ 1801–1884, in furtherance of its goal "to conserve and manage the fishery resources . . . of the United States," 16 U.S.C. § 1801(b)(1), authorizes the Secretary of Commerce, and the National Marine Fisheries Service ("the Service") as the Secretary's delegee, to implement a comprehensive fishery management program, *id.* § 1801(a)(6); *see id.* §§ 1854,

---

[*] Chief Judge Srinivasan was drawn to replace Judge Jackson, now Justice Jackson, who heard argument and did not participate in this opinion.

1855(d). Key to the statutory scheme is the promulgation and enforcement of "fishery management plans." Plans and periodic amendments are developed by regional fishery management councils, *id.* § 1852(h)(1), and include measures "necessary and appropriate for the conservation and management of the fishery," *id.* § 1853(a)(1)(A). The proposing council may include specific conservation and management measures enumerated in 16 U.S.C. § 1853(b), as well as any other measures "determined to be necessary and appropriate," *id.* § 1853(b)(14). In addition, the council may propose implementing regulations. *Id.* § 1853(c).

Nine fisheries, including the Atlantic herring fishery, are managed by the New England Fishery Management Council (the "Council"). *Id.* § 1852(a)(1)(A), (h)(1). The Council submitted the Omnibus Amendment to the Service, which published a notice of availability and subsequently opened a comment period. Notice of Availability, 83 Fed. Reg. 47,326 (Sept. 19, 2018); Notice of Proposed Rulemaking ("NPRM"), 83 Fed. Reg. 55,665 (Nov. 7, 2018). The Service approved the Omnibus Amendment on December 18, 2018, and published the Final Rule on February 7, 2020.[1] The Amendment and the Rule set out a standardized process to implement and revise industry-funded monitoring programs in the New England fisheries. Omnibus Amendment at v; Final Rule, 85 Fed. Reg. at 7,414–17. Plan coverage requirements may be waived if monitoring is unavailable or certain exemptions based on use of monitoring equipment or catch size apply. *See* Final Rule, 85 Fed. Reg. at 7,417, 7,419–20.

---

[1] *Industry-Funded Monitoring: An Omnibus Amendment to the Fishery Management Plans of the New England Fishery Management Council* (2018) ("Omnibus Amendment"); Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring Final Rule, 85 Fed. Reg. 7,414 (Feb. 7, 2020) ("Final Rule").

The monitoring program for the Atlantic herring fishery covers 50 percent of herring trips. The 50-percent coverage target is met through a combination of limited Service-funded monitoring pursuant to the fishery management plan, *see* 16 U.S.C. § 1853(a)(11), and, for the difference between the target and Service-funded monitoring, industry-funded monitoring, with owners of vessels selected by the Service to carry an industry-funded monitor and pay the associated costs (other than administrative costs). Final Rule, 85 Fed. Reg. at 7,417. The Service estimated industry costs to the herring fishery "at $710 per day," which in the aggregate could reduce annual returns by "approximately 20 percent." *Id.* at 7,418.

Appellants are commercial fishermen who regularly participate in the Atlantic herring fishery. They filed a lawsuit alleging, as relevant, that the Act did not authorize the Service to create industry-funded monitoring requirements and that the rulemaking process was procedurally irregular. The district court ruled on the parties' cross-motions for summary judgment in the government's favor. *Loper Bright Enters., Inc. v. Raimondo*, 544 F. Supp. 3d 82, 127 (D.D.C. 2021).

## II.

On appeal, appellants' challenge to the Final Rule presents the question how clearly Congress must state an agency's authority to adopt a course of action. This court is aware of the Supreme Court precedent that Congress must clearly indicate its intention to delegate authority to take action that will have major and far-reaching economic consequences. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 323–24 (2014). But that "major questions doctrine" applies only in those "'extraordinary cases' in which the 'history and breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate

before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2595 (2022) (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). Here, the Service's challenged actions are distinct. Congress has delegated broad authority to an agency with expertise and experience within a specific industry, and the agency action is so confined, claiming no broader power to regulate the national economy. The court's review thus is limited to the familiar questions of whether Congress has spoken clearly, and if not, whether the implementing agency's interpretation is reasonable. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984). Although the Act may not unambiguously resolve whether the Service can require industry-funded monitoring, the Service's interpretation of the Act as allowing it to do so is reasonable.

## A.

Appellants contend the Act permits the Service to require at-sea monitors but prohibits any industry-funded monitoring programs beyond three circumstances. The Service responds that the Act unambiguously authorizes it to implement industry-funded monitoring requirements. The court applies the familiar two-step *Chevron* framework. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 77 (D.C. Cir. 2021) (citing *Chevron*, 467 U.S. at 842–43). At *Chevron* Step One, the court, "employing traditional tools of statutory interpretation," evaluates "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842–43 & n.9. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute considered as a whole is ambiguous, then at *Chevron* Step Two the court defers to any "permissible

construction of the statute" adopted by the agency. *Cigar Ass'n of Am.*, 5 F.4th at 77 (quoting *Chevron*, 467 U.S. at 843).

At *Chevron* Step One, the court "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (internal quotation marks omitted). Section 1853(b)(8) provides fishery management plans may "require that one or more observers be carried on board a vessel . . . for the purpose of collecting data necessary for the conservation and management of the fishery." That text makes clear the Service may direct vessels to carry at-sea monitors but leaves unanswered whether the Service must pay for those monitors or may require industry to bear the costs of at-sea monitoring mandated by a fishery management plan. When Congress has not "directly spoken to the precise question at issue," the agency may fill this gap with a reasonable interpretation of the statutory text. *Chevron*, 467 U.S. at 842.

The Service maintains that two additional features of the Act, when paired with Section 1853(b)(8), unambiguously establish authority to require industry-funded monitoring. First, Section 1853 contains two "necessary and appropriate" clauses that permit plans approved by the Service to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(14); *see also id.* § 1853(a)(1)(A) (mandating "measures . . . necessary and appropriate for the conservation and management of the fishery"). Second, the penalty provisions allow the Service to impose permit sanctions for failure to make "any payment required for observer services provided to or contracted by an owner or operator," *id.* § 1858(g)(1)(D), and make unlawful various acts committed against "any data collector employed

by the [Service] or under contract to any person to carry out responsibilities under [the Act]," *id.* § 1857(1)(L).

Taken together, these provisions of the Act signal the Service may approve fishery management plans that mandate at-sea monitoring for a statutory purpose. Section 1853(b)(8) grants authority to require that vessels carry at-sea monitors. Sections 1853(a)(1)(A) and (b)(14) grant authority to implement measures "necessary and appropriate" — a "capacious[]" grant of power that "leaves agencies with flexibility," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) — to achieve the Act's conservation and management goals. The penalties in Sections 1857 and 1858 further indicate that Congress anticipated industry's use of private contractors. Still unresolved, however, is the question of whether the Service may require industry to bear the costs of at-sea monitoring mandated by a fishery management plan.

When an agency establishes regulatory requirements, regulated parties generally bear the costs of complying with them. In *Michigan v. EPA*, 135 S. Ct. 2699, 2711 (2015), the Supreme Court held that an agency implementing a policy under wide-ranging "necessary and appropriate" authority must consider the costs of compliance. That principle presupposes that a "necessary and appropriate" clause vests an agency with some authority to impose compliance costs. Here, the Act's national standards for fishery management plans direct the Service to "minimize costs" of conservation and management measures, 16 U.S.C. § 1851(a)(7), and to "minimize adverse economic impacts" of such measures "on [fishing] communities," *id.* § 1851(a)(8). Those statutory admonitions to reduce costs seem to presume that the Service may impose some costs, as "minimize" does not mean eliminate entirely. In addition, neither Section 1853(b)(8) nor any other provision of the Act imposes a funding-related

restriction on the Service's authority to require monitoring in a plan. That also suggests the Act permits the Service to require industry-funded monitoring.

The inference that the Service may require fishing vessels to incur costs associated with meeting the 50-percent monitoring coverage target is not, however, wholly unambiguous. Nothing in the record definitively establishes whether at-sea monitors are the type of regulatory compliance cost that might fall on fishing vessels by default or whether Congress would have legislated with that assumption. Absent such an indication, the court cannot presume that Section 1853(b)(8), even paired with the Act's "necessary and appropriate" and penalty provisions, unambiguously affords the Service power to mandate that vessels pay for monitors. *See N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020).

Appellants maintain that Sections 1821, 1853a(e), and 1862, which create monitoring programs with some similarities to the Omnibus Amendment's monitoring program, give rise by negative implication to the inference that the Act unambiguously deprives the Service of authority to create additional industry-funded monitoring requirements. This *expressio unius* reasoning, "when countervailed by a broad grant of authority contained within the same statutory scheme, . . . is a poor indicator of Congress' intent." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014). Examination of each of the three monitoring programs further illustrates why appellants' view is unfounded.

First, the limited access privilege program created in Section 1853a(e) authorizes a council to establish "a program of fees . . . that will cover the costs of management, data collection and analysis, and enforcement activities." It does not list monitoring as a covered activity. *See id.* Although

monitoring might qualify as "data collection and analysis," this provision does not speak directly to this point, nor does it say anything about who may fund observers. The canon that "the specific governs the general," *RadLAX Gateway Hotel, LLC v. Amalg. Bank*, 566 U.S. 639, 645 (2012); *see Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021), is unhelpful to appellants in this context because there is no relevant "conflict" between statutory terms that do not address the same subject, *Genus Med. Techs.*, 994 F.3d at 638–39. Section 1853a(e) therefore does not suggest any limitation on the Service's discretion to impose monitoring costs on industry under Section 1853(b)(8).

Second, the North Pacific Council monitoring program created by Section 1862, which "requires that observers be stationed on fishing vessels" and "establishes a system . . . of fees . . . to pay for the cost of implementing the plan," 16 U.S.C. § 1862(a)(1)–(2), is similarly distinguishable. These fees are to be "collected" by the Service, *id.* § 1862(b)(2), and deposited into a North Pacific Fishery Observer Fund established by the Act and "in the Treasury," *id.* § 1862(d), for disbursement to cover the costs of the monitoring program, *see id.* § 1862(a), (e). This special fee program also does not suggest that the Service lacks authority to require industry-funded observers in all other fisheries. The fee program in Section 1862 institutes a different funding mechanism from that of the Omnibus Amendment and Final Rule: under Section 1862, money collected from regulated parties passes through government coffers, while under the Omnibus Amendment and Final Rule, regulated vessel owners pay third-party monitors directly to supply services required for regulatory compliance. Congress's specific authorization of a single fishery program funded by fees paid to the government does not unambiguously demonstrate that the Act prohibits the Service from implementing

a separate program in which industry pays the costs of compliance to service providers without any government pass-through.

Section 1821 creates a foreign fishing vessel monitoring program, which authorizes the Secretary to impose a "surcharge" to "cover all the costs of providing a United States observer" aboard foreign vessels. *Id.* § 1821(h)(4). Generally, observers on foreign vessels are funded through "surcharges [to owners] collected by the Secretary" and deposited in an earmarked U.S. government fund, *id.*, a fee program roughly analogous to the North Pacific Council monitoring program. In the event of insufficient appropriations, however, Section 1821 establishes a "supplementary observer program" by which "certified observers or their agents" are "paid by the owners and operators of foreign fishing vessels for observer services." *Id.* § 1821(h)(6). This provision for industry-funded observers in the foreign-fishing section of the Act, does not show that Congress implicitly intended to preclude the Service from requiring any other industry-funded monitoring. *See Util. Air Regul. Grp.*, 573 U.S. at 323–24. Its contingency plan for monitoring in the foreign-fishing context has no unambiguous consequences for the Service's authority to implement industry-funded monitoring in other contexts. By providing for industry-funded observers as part of a contingency in the foreign-fishing provisions of the Act, it appears doubtful that Congress intended implicitly to preclude the Service from requiring industry-funded monitoring in all other circumstances. Further, the Act's penalty provisions offset negative inferences that might be drawn from Section 1821. *See* 16 U.S.C. §§ 1857(1)(L), 1858(g)(1)(D). Rather, these broad provisions indicate that Congress anticipated the use of privately retained contractors to comply with the Act's requirements. And the penalties in a broadly applicable section of the Act appear to recognize the possibility of industry-contracted and funded observers beyond the foreign-vessel

context. If Congress had intended for penalties associated with industry-funded monitoring to apply only in the foreign fishing context, the court would expect that Congress in the penalty provisions would have specifically referenced foreign vessels or included a cross-reference to the foreign fishing provision.

Finally, appellants claim that, given the substantial costs of industry-funded monitoring to herring fishing companies, "Congress would not have delegated 'a decision of such economic and political significance to an agency in so cryptic a fashion'" as reliance on "necessary and appropriate" authority. Appellants' Br. 41 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160). Indeed, an agency may not rely on a "necessary and appropriate" clause to claim implicitly delegated authority beyond its regulatory lane or inconsistent with statutory limitations or directives. *See, e.g.*, *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2487–88 (2021); *Michigan*, 135 S. Ct. at 2707–08; *N.Y. Stock Exch.*, 962 F.3d at 554–55. The Service does not do so here because its interpretation falls within the boundaries set by the Act. Section 1853(b)(8) expressly envisions that monitoring programs will be created and, through its silence, leaves room for agency discretion as to the design of such programs. In addition, at-sea monitoring relates to the Service's interest in fishery management and the Act contains no bar on industry-funded monitoring programs, instead permitting plans to "prescribe such other measures, requirements, or conditions and restrictions" as are "necessary and appropriate for the conservation and management of the fishery," *id.* § 1853(b)(14); *see id.* § 1853(a)(1)(A). The Service's understanding of Section 1853(b)(8) and the "necessary and appropriate" clauses as encompassing industry-funded monitoring thus does not exceed statutory limits.

Nonetheless, the text does not compel the Service's interpretation of the Act as granting authority by omission to

require industry-funded monitoring. Courts "construe [a statute's] silence as exactly that: silence." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015). Neither Section 1853(b)(8) nor any other provision of the Act explicitly allows the Service to pass on to industry the costs of monitoring requirements included in fishery management plans. Nor do the traditional tools of statutory interpretation provide another basis on which to conclude that the Act unambiguously supports the Service's interpretation. Congress has thus provided no wholly unambiguous answer at *Chevron* Step One as to whether the Service may require industry-funded monitoring in the Omnibus Amendment and Final Rule. Although an agency's interpretation need not be compelled by the text for it to prevail at Step One, here, where there may be some question as to Congress's intent, particularly in view of appellants' cost objection, it behooves the court to proceed to Step Two of the *Chevron* analysis.

Pursuant to Step Two, an agency's interpretation can prevail if it is a "reasonable resolution of an ambiguity in a statute that the agency administers," *Michigan*, 135 S. Ct. at 2707, and "the agency has offered a reasoned explanation for why it chose that interpretation," *Cigar Ass'n of Am.*, 5 F.4th at 77 (internal quotation marks omitted). Under this deferential standard, the Service's interpretation of the Act as authorizing additional industry-funded monitoring programs is reasonable. Section 1853(b)(8), paired with the Act's "necessary and appropriate" clauses, demonstrates that the Act considers monitoring "necessary and appropriate" to further the Act's conservation and management goals. That conclusion provides a reasonable basis for the Service to infer that the practical steps to implement a monitoring program, including the choice of funding mechanism and cost-shifting determinations, are likewise "necessary and appropriate" to implementation of the Act. *See* Final Rule, 85 Fed. Reg. at 7,422–23.

In addition, the Final Rule provides a reasoned explanation for the Service's interpretation. The Rule noted that Section 1853(b)(8) authorizes the Service to require at-sea monitors "for the purpose of collecting data necessary for the conservation and management of the fishery. *Id.* at 7,422 (quoting 16 U.S.C. § 1853(b)(8)). It further explained that industry-funded monitoring to reach the new 50-percent coverage target would best serve the Act's conservation and management goals. In particular, increased monitoring would permit the Service "to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management." *Id.* at 7,423. The Rule also stated that industry-funded monitoring was consistent with other provisions of the Act that impose compliance costs on industry. *Id.* at 7,422. This explanation reasonably tied the industry-funded monitoring requirement to the Act's purposes. The Service's interpretation of the Act is therefore owed deference at *Chevron* Step Two.

Our dissenting colleague agrees that the *Chevron* framework governs this case but disagrees about how it applies, asserting that the court should reach *Chevron* Step Two only if "the statute is ambiguous" *and* "Congress either explicitly or implicitly delegated authority to cure that ambiguity." Dis. Op. at 5 (internal quotation marks omitted); *see id.* at 5 n.16. The dissent suggests that "Congress's silence on a given issue . . . [generally] indicates a lack of authority," *id.* at 6, but *Chevron* instructs that judicial deference is appropriate "if the statute is silent *or* ambiguous with respect to the specific issue," 467 U.S. at 843 (emphasis added). The Supreme Court has affirmed its *Chevron* analysis, *see, e.g.*, *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), and this court has reacknowledged its binding force, *see, e.g.*, *Sierra Club v. EPA*, 21 F.4th 815, 818–19 (D.C. Cir. 2021). The dissent's reference to recent cases in which the Supreme Court has not applied the

framework, *see* Dis. Op. at 5 & n.6, does not affect the obligation of this court to "leav[e] to [the Supreme] Court the prerogative of overruling its own decisions," *Agri Processor Co. v. NLRB*, 514 F.3d 1, 8 (D.C. Cir. 2008) (second alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Not every statutory silence functions as an implicit delegation. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004). But Section 1853(b)(8)'s silence on the issue of cost of at-sea monitoring provides no basis for applying different standards of review here. Dis. Op. at 8–9. Under *Chevron*, such silence in the context of a comprehensive statutory fishery management program for the Service to implement, 16 U.S.C. §§ 1801(a)(6), 1854, 1855(d), is a lawful delegation, *Chevron,* 467 U.S. at 842–44. Furthermore, the Supreme Court has instructed that a broad "necessary and appropriate" provision, as appears in the Act, "leaves agencies with flexibility" to act in furtherance of statutory goals, *Michigan*, 135 S. Ct. at 2707, and here the Service pointed to the Act's conservation and management goals. Speculation that the Service's interpretation of its authority may lead to exorbitant regulatory costs to industry, *see* Dis. Op. at 11, overlooks *Chevron* Step Two's reasonableness limitation. Nor, in these circumstances, is Congress's provision for industry-funded monitoring in three unique situations properly understood to eliminate the Service's authority to create industry-funded monitoring programs in any other situation, *see id.* at 12–14. Under the well-established *Chevron* Step Two framework, the Service's interpretation of the Act to allow industry-funded monitoring was reasonable.

15

**B.**

Appellants' alternative challenge emphasizes that this court reviews the grant of summary judgment *de novo* and the Omnibus Amendment and Final Rule were enacted and adopted pursuant to the Administrative Procedure Act ("APA"). Under the APA's deferential standard, the court upholds agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Cigar Ass'n of Am*, 5 F.4th at 74. "An agency is owed no deference," however, "if it has no delegated authority from Congress to act." *N.Y. Stock Exch.*, 962 F.3d at 553. The court "determines whether the resulting regulation exceeds the agency's statutory authority" before it determines whether the regulation "is arbitrary or capricious," *id.* at 546 (citing *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990)), as is addressed in subsection A.

Appellants urge that the Omnibus Amendment and Final Rule are arbitrary and capricious, even if statutorily authorized, "because they do not adequately account for the economic cost" of industry-funded monitoring for participants in the Atlantic herring fishery. Appellants' Br. 55. To survive arbitrary and capricious review, an agency "may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan*, 135 S. Ct. at 2707 (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Cost is such a factor in view of the Act's directive that fishery management plans minimize adverse effects and costs to the fishing community wherever possible. *See* 16 U.S.C. § 1851(a)(7), (8).

The record shows the Service took note of evidence that the Atlantic herring industry-funded monitoring program costs

impacted vessels $710 per day and could reduce annual returns by approximately 20 percent. Final Rule, 85 Fed. Reg. at 7,418. It evaluated the economic impacts of the program in detail, *see id.* at 7,417–22, 7,428–29, responded to comments raising cost-related concerns, *see id.* at 7,424–26, and described its efforts to minimize economic impacts on herring fishery participants, *see id.* at 7,429–30. For example, vessel owners may request waivers of industry-funded monitoring coverage on trips intending to land less than 50 metric tons of herring, and midwater trawl vessels may comply with the requirement through electronic monitoring instead of retaining a private monitor. *Id.* at 7,430. Further, in the Rule, the Service explained its choice of a 50-percent coverage target as "balanc[ing] the benefit of additional monitoring with the costs associated with additional monitoring," *id.* at 7,425, and adopted exemptions designed to address adverse effects on smaller vessels, *see id.* at 7,419–20, 7,425, 7,430. So, the Service's decision to proceed with an industry-funded monitoring requirement after extensive deliberations on the question of cost was not arbitrary or capricious.

## C.

Finally, appellants contend that promulgation of the Omnibus Amendment and the Final Rule was procedurally improper. Specifically, appellants challenge the Service's failure to comply with the Act's timeline for review of the Amendment, *see* 16 U.S.C. §§ 1853, 1854, and its use of overlapping comment periods for the Amendment and the Rule. Neither contention is persuasive.

That the Service did not follow the Act's timeline provides no basis for relief here. The Service published the notice of availability for the Omnibus Amendment three days after the statutory deadline, *see* 16 U.S.C. § 1854(a)(1)(A)–(B), (5), and

adopted the Final Rule more than a year after its comment period ended, *see* Final Rule, 85 Fed. Reg. at 7,414, contrary to the requirement that implementing regulations be promulgated within thirty days of the close of their comment period, *see* 16 U.S.C. § 1854(b)(3). Procedural errors that are "technical" in nature and "therefore harmless" are "not grounds for vacating or remanding." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 217 (D.C. Cir. 2013); *see Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006). Appellants do not identify any harm or prejudice resulting from the alleged delay. In addition, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) (internal quotation marks omitted); *see Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 873–74 (D.C. Cir. 2021). The Act does not penalize missed deadlines, and appellants do not point to any basis for this court *sua sponte* to vacate the Final Rule.

Appellants' suggestion that the Service "prejudged the legality" of the Omnibus Amendment through its use of overlapping comment periods with the Final Rule fares no better. The Act requires that notice and comment on a plan amendment and its accompanying regulations occur in tandem. *See* 16 U.S.C. §§ 1853(c)(1), 1854(a)(1), (5), 1854(b)(1)(A). Even if the statutory text did not control, the Service may initiate implementing regulations of its own accord, subject to APA notice-and-comment requirements that it "publish [a] notice of proposed rulemaking in the Federal Register and . . . accept and consider public comments on its proposal." *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014) (citing 5 U.S.C. § 553). Here, the Service set comment periods of sixty and forty-five days, respectively, for the Omnibus Amendment and the Final Rule and stated that it would

consider comments received on either document in its decision to approve the Amendment.  NPRM, 83 Fed. Reg. at 55,667.  The Act does not require publication of approval of plan amendments.  *See* 16 U.S.C. § 1854(a)(3).  So, the Service could address public comments on the Omnibus Amendment upon promulgation of the Final Rule, *see* 85 Fed. Reg. at 7,422–27.  In view of Congress's expectation that the Service would consider comments on plan amendments and implementing regulations at the same time, *see* 16 U.S.C. §§ 1853(c)(1), 1854(a)(1), (5), 1854(b)(1)(A), appellants fail to show a lack of fair notice and a meaningful opportunity to comment as the APA requires.  *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982).

Accordingly, the court affirms the district court's grant of summary judgment to the Service and denial of summary judgment to appellants.

WALKER, *Circuit Judge*, dissenting:

Did Congress authorize the National Marine Fisheries Service to make herring fishermen in the Atlantic pay the wages of federal monitors who inspect them at sea?

Congress unambiguously did not.

I

A fishery is both a group of fish and the fishing for that group.[1] The Magnuson-Stevens Act governs all fisheries in federal waters.[2] Its goal is to keep the fisheries healthy so that Americans can enjoy the economic, recreational, and nutritional benefits of a marine ecosystem.[3]

In pursuit of that goal, the Act allows the National Marine Fisheries Service to approve fishery management plans, which set rules for the fisheries they govern.[4] Those plans are developed by regional councils and include provisions specifying things like the number of fish that will be harvested in the fishery, the type of fishing gear to be used, and the reporting methods required.[5] When a plan needs updating, the

---

[1] 16 U.S.C. § 1802(13).

[2] *Id.* § 1801 *et seq.*

[3] *Id.* § 1801(b).

[4] *Id.* §§ 1853, 1854(a). The Fisheries Service's authority is delegated from the Secretary of Commerce. Although the Appellees also include the Secretary of Commerce, the Department of Commerce, and officials in the National Oceanic and Atmospheric Administration, I refer to the appellees as the "Fisheries Service" because they are the most direct regulators in this matter.

[5] *Id.* § 1853(a)(4)-(5), (a)(11), (b)(4). The regional councils were established by the Magnuson-Stevens Act and are made up of representatives from various interested sectors (commercial, recreational, governmental, and academic). *Id.* § 1852.

relevant council submits a proposed amendment to the Fisheries Service for review.[6] The council may also propose corresponding implementing regulations.[7] Then the Fisheries Service must publish those proposals, take comments, and approve or disapprove of the proposals.[8] If it approves, it will promulgate them as final regulations.[9]

That's what happened here. The New England Council amended the Atlantic herring fishery management plan to require that fishermen allow at-sea monitors on many of their fishing trips, and the Fisheries Service approved its amendment.[10] The at-sea monitors are third-party inspectors who go aboard fishing vessels to keep an eye on operations. They track things like how many of which fish are being caught with what gear. No one disputes that the Magnuson-Stevens Act allows the Fisheries Service to impose this monitoring requirement.

But providing a monitor for a days-long fishing voyage can get expensive, and the Fisheries Service has had trouble affording its preferred monitoring programs with just its congressionally appropriated funds.[11] Add to that a further

---

[6] *Id.* § 1852(h)(1).

[7] *Id.* § 1853(c).

[8] *Id.* § 1854(a).

[9] *Id.* § 1854(b)(3).

[10] Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry Funded Monitoring, 85 Fed. Reg. 7417 (Feb. 7, 2020).

[11] Fisheries of the Northeastern United States; Atlantic Herring Fishery; Amendment 5, 79 Fed. Reg. 8,786, 8,792-93 (Feb. 13, 2014) (The Fisheries Service has been working since at least 2013 to find a legal way to use industry funding to increase observer coverage as

problem for the Fisheries Service: Congress generally prohibits an agency from collecting fees and keeping the money from those fees for the agency's own purposes.[12] Instead, absent express statutory authority to keep and spend that money, agencies can only spend as much money as Congress appropriates.[13]

Here, the Fisheries Service attempted a workaround. It decided to make fishing companies, like Loper Bright Enterprises, hire and pay for their own at-sea monitors. The Fisheries Service estimates that for the Atlantic Herring fishery, those monitors will cost more than $700 per day and could reduce financial returns to the fishermen by twenty percent.

The fishermen challenged the amendment and the implementing regulations in district court and now appeal the

---

"[b]udget uncertainties prevent [the Fisheries Service] from being able to commit to paying for increased observer coverage in the herring fishery."); *see also* Fisheries of the Northeastern United States; Atlantic Mackerel, Squid, and Butterfish Fisheries; Amendment 14, 79 Fed. Reg. 10,029, 10,038 (Feb. 24, 2014) (Without industry funding, "increased observer coverage levels would amount to an unfunded mandate, meaning regulations would obligate [the Fisheries Service] to implement something it cannot pay for.").

[12] 31 U.S.C. § 3302(b) (With one unrelated exception, "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim.").

[13] *Id.* § 1341(a)(1) ("An officer or employee of the United States Government or of the District of Columbia government may not— (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation").

4

court's decision granting summary judgment for the Fisheries Service.[14]

I would reverse the judgment of the district court because the Magnuson-Stevens Act unambiguously does not authorize the Fisheries Service to force the fishermen to pay the wages of federally mandated monitors.

II

Agencies are creatures of Congress, so they have no authority apart from what Congress bestows.[15]

The Fisheries Service points to the Magnuson-Stevens Act as its source of authority for requiring fishermen to pay for at-sea monitors. We review the Fisheries Service's interpretation

---

[14] *Loper Bright Enterprises, LLC v. Raimondo*, 544 F. Supp. 3d 82, 127 (D.D.C. 2021).

[15] *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"); *Motion Picture Association of America, Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("An agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress."); *Railway Labor Executives' Association v. National Mediation Board*, 29 F.3d 655, 670 (D.C. Cir.), *amended*, 38 F.3d 1224 (D.C. Cir. 1994) ("Agencies owe their capacity to act to the delegation of authority, either express or implied, from the legislature."); *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").

of that statute under the two-step *Chevron* framework.[16] First, we ask "whether Congress has directly spoken to the precise question at issue" or "left a gap for the agency to fill."[17] At that stage, in searching for direction from Congress, we empty our interpretive toolkit.[18] And if it's clear that the text does not authorize the agency's action, the analysis ends, and the agency loses.[19] Only if the statute is ambiguous, and only if "Congress either explicitly or implicitly delegated authority to cure that ambiguity," do we proceed to *Chevron*'s second step and defer to the agency's reasonable interpretation of the ambiguity.[20]

---

[16] *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-44 (1984). *But see Becerra v. Empire Health Foundation*, 142 S. Ct. 2354 (2022) (not mentioning *Chevron*); *National Federation of Independent Business v. OSHA*, 142 S. Ct. 661 (2022) (same); *BNSF Railway Co. v. Loos*, 139 S. Ct. 893 (2019) (same); *Pereira v. Sessions*, 138 S. Ct. 2105, 2121 (2018) (Kennedy, J., concurring) ("Given the concerns raised by some Members of this Court, it seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that decision." (citations omitted)).

[17] *Chevron*, 467 U.S. at 842-43.

[18] *Arizona Public Service Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000).

[19] *Chevron*, 467 U.S. at 842-43; *see also Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (plurality opinion) ("in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write").

[20] *Hearth, Patio & Barbecue Association v. United States Department of Energy*, 706 F.3d 499, 504 (D.C. Cir. 2013) ("The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. Mere ambiguity in a statute is not evidence of congressional delegation of authority." (quoting *American Bar Association v. Federal Trade Commission*, 430 F.3d 457, 469 (D.C. Cir. 2005))).

Congress's silence on a given issue does not automatically create such ambiguity or give an agency carte blanche to speak in Congress's place.[21] In fact, all else equal, silence indicates a lack of authority.[22]

That means that when agency action is challenged, it is not the challenger's job to show that Congress has specifically prohibited the challenged action.[23] Holding challengers to that burden would be "entirely untenable."[24] Instead, an agency must positively demonstrate where Congress explicitly or implicitly empowered it to act.

---

[21] *United States Telecom Association v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) ("the failure of Congress to use 'Thou Shalt Not' language doesn't create a statutory ambiguity of the sort that triggers *Chevron* deference"); *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995) ("we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power").

[22] *United States Telecom Association*, 359 F.3d at 566 ("The statutory 'silence' simply leaves that lack of authority untouched.").

[23] *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1082 (D.C. Cir. 2017) ("The [agency] and the dissent seem to suggest that the agency may take an action . . . so long as Congress has not *prohibited* the agency action in question. That theory has it backwards as a matter of basic separation of powers and administrative law. The [agency] may only take action that Congress has *authorized*."); *Railway Labor Executives' Association*, 29 F.3d at 671 ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.").

[24] *Motion Picture Association*, 309 F.3d at 805-06; *see also Gulf Fishermens Association v. National Marine Fisheries Service,* 968 F.3d 454, 456 (5th Cir. 2020), *as revised* (Aug. 4, 2020) ("Congress does not delegate authority merely by not withholding it").

III

Both sides agree that nowhere in the Magnuson-Stevens Act does Congress explicitly empower the Fisheries Service to require the Atlantic herring fishermen to fund an at-sea monitoring program. So to prevail, the Fisheries Service must point to some implicit delegation of that authority.

It has failed to do so. The Act unambiguously does not authorize the Fisheries Service to require these fishermen to pay the wages of at-sea monitors.[25]

A

The Fisheries Service first relies on 16 U.S.C. § 1853(b)(8), which provides that fishery management plans may:

> **require that one or more observers be carried on board a vessel** of the United States engaged in fishing for species that are subject to the plan, for the purpose

---

[25] *But see Relentless Inc. v. United States Department of Commerce*, 561 F. Supp. 3d 226, 238 (D.R.I. 2021) (Another group of herring fishermen challenged the same industry-funding provision, and citing our district court, the District of Rhode Island found that the Fisheries Service "reasonably interpreted" the Magnuson-Stevens Act "to authorize" industry-funded monitors in the Atlantic herring fishery.); *Goethel v. Pritzker*, No. 15-CV-497-JL, 2016 WL 4076831, at \*6 (D.N.H. July 29, 2016)*, aff'd sub nom. Goethel v. United States Department of Commerce.*, 854 F.3d 106, 108 (1st Cir. 2017) (The district court found that the Magnuson-Stevens Act authorized a similar industry-funding scheme in a different fishery, but the First Circuit affirmed on timeliness grounds, expressly declining to decide whether industry funding violated the Act.).

of collecting data necessary for the conservation and management of the fishery.[26]

That provision allows the agency to require that fishermen give at-sea monitors a place on their vessels — the fishermen must let the monitor "be carried."

The Fisheries Service argues that such authority implicitly includes the authority to make the fishermen pay the monitors' wages because the wages are simply an incidental cost of complying with the duty to allow monitors onboard. In the agency's eyes, it's no different than, say, the cost of buying statutorily-required fishing gear.

But that analogy doesn't hold up.

First, the Act's language meaningfully differs in its treatment of gear and observers. Section 1853(b)(4) allows plans to "require the use" of certain fishing gear. If the Act similarly allowed plans to *require the use* of an at-sea monitor, perhaps the Fisheries Service could argue that the cost of procuring the monitor was incidental to that command. But § 1853(b)(8) doesn't allow plans to require that fishermen use observers. It only allows them to require that fishermen let observers "be carried on board."

A cost incidental to *carrying* an observer might include the additional fuel costs of a marginally heavier boat or the opportunity cost of giving to the monitor a bunk that would otherwise be occupied by a working fisherman. Those are costs that necessarily follow when a fisherman lets a monitor on his boat. By contrast, there is no inherent, or even intuitive,

---

[26] 16 U.S.C. § 1853(b)(8) (emphasis added).

connection between paying a monitor's wage and providing him passage.

Second, inspection requirements and gear requirements are different classes of impositions on regulated parties, and they carry different expectations.[27] Regulatory mandates, such as gear requirements, often carry compliance costs. But the Fisheries Service has identified no other context in which an agency, without express direction from Congress, requires an industry to fund its inspection regime.

Even if the Fisheries Service had found a few outliers, it is not usual to require a regulated party to pay the wages of its monitor when the statute is silent. Nor is it expected. In short, it is not the type of thing that goes without saying. And here, Congress didn't say it.[28]

## B

The Fisheries Service next asks us to find its authority in § 1853's "necessary and appropriate" clauses.[29] The first such clause, § 1853(a)(1)(A), says that fishery management plans:

> **shall contain the conservation and management measures**, applicable to foreign fishing and fishing by vessels of the United States, **which are necessary**

---

[27] Those expectations, of course, inform our interpretation of how "ordinary people understand the rules that govern them." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1485 (2021).

[28] *See Mozilla Corp. v. FCC*, 940 F.3d 1, 83 (D.C. Cir. 2019) ("No matter how desirous of protecting their policy judgments, agency officials cannot invest themselves with power that Congress has not conferred." (citations omitted)).

[29] 16 U.S.C. § 1853(a)(1)(A), (b)(14).

> **and appropriate** for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery.[30]

And the second such clause, § 1853(b)(14), similarly says that fishery management plans:

> **may prescribe such other measures**, requirements, or conditions and restrictions **as are determined to be necessary and appropriate** for the conservation and management of the fishery.[31]

The Fisheries Service argues that because the monitors' data collection is important and because the Fisheries Service can't afford it, it is necessary and appropriate to make the fishermen fund it.

For three reasons, I disagree.

First, context tells us that the Fisheries Service's capacious reading is wrong. Section 1853(a) says that fishery management plans must, for example, describe the fishery, specify a reporting methodology, and identify essential fish habitats.[32] And § 1853(b) says that fishery management plans may, for example, designate protected coral zones, limit the type and amount of fish to be caught, and assess the effect of plan measures on certain fish stocks.[33] Those and the other measures surrounding the "necessary and appropriate"

---

[30] *Id.* § 1853(a)(1)(A) (emphases added).

[31] *Id.* § 1853(b)(14) (emphases added).

[32] *Id.* § 1853(a)(2), (a)(11), (a)(7).

[33] *Id.* § 1853(b)(2)(B), (b)(3)(A), (b)(9).

provisions "inform[] the grant of authority by illustrating the kinds of measures that could be necessary" or appropriate.[34] And none of the measures in those sections look anything like the funding scheme that the Fisheries Service contemplates here.

Second, the logic of the Fisheries Service's argument could lead to strange results.[35] Could the agency require the fishermen to drive regulators to their government offices if gas gets too expensive? Having the agency officials at work may be "appropriate" for "management of the fishery." Yet I doubt that Congress meant to allow for free fisherman chauffeurs.

Or what if Congress were to entirely defund the compliance components of the Fisheries Service — could the agency continue to operate by requiring the industry to fund a legion of independent contractors to replace the federal employees? That generous interpretation of "necessary and

---

[34] *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485, 2488 (2021); *see also Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("under the established interpretative canons of *noscitur a sociis* and *ejusdem generis*, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (cleaned up)); *see also NASDAQ Stock Market, LLC v. SEC*, 961 F.3d 421, 428 (D.C. Cir. 2020) (applying the canon to reject an agency interpretation within the *Chevron* framework).

[35] *Merck & Co., Inc., v. United States Department of Health & Human Services*, 962 F.3d 531, 541 (D.C. Cir. 2020) ("the breadth of the Secretary's asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed").

appropriate" could undermine Congress's power of the purse.[36] So although the words "necessary and appropriate" may be broad, they cannot be as limitless as the Fisheries Service suggests.[37]

Third, if Congress had wanted to allow industry funding of at-sea monitors in the Atlantic herring fishery, it could have said so. But it instead chose to expressly provide for it in only certain *other* contexts.[38] The existence of specific provisions

---

[36] *See, e.g.*, John Holland & Laura Allen*, An Analysis of Factors Responsible for the Decline of the U.S. Horse Industry: Why Horse Slaughter Is Not the Solution*, 5 Kentucky Journal of Equine, Agriculture, and Natural Resources Law 225, 225-27 (2013) (Congress used its funding power in its effort to end commercial horse slaughter by defunding the requisite ante-mortem inspections.).

[37] *See Alabama Association of Realtors*, 141 S. Ct. at 2489 ("It is hard to see what measures this interpretation would place outside the CDC's reach, and the Government has identified no limit . . . beyond the requirement that the CDC deem a measure necessary." (cleaned up)); *Mozilla Corp.*, 940 F.3d at 75 ("even the allowance of wide latitude in the exercise of delegated powers is not the equivalent of untrammeled freedom to regulate activities over which the statute fails to confer, or explicitly denies, Commission authority" (cleaned up)).

[38] 16 U.S.C. § 1862(a) (North Pacific fishery), § 1821(h)(4) (foreign fishing), § 1853a(e)(2) (limited access privilege programs). A limited access privilege program is one in which an entity is permitted to catch a specified portion of the total allowable catch for all the fishermen per fishing season. Although the fee provision for limited access privilege programs does not itself mention observers, it nevertheless covers them. Section 1853a(c)(1)(H) instructs that a limited access privilege program shall "include an effective system for enforcement, monitoring, and management of the program, including the use of observers," and subsection (e) instructs that

for industry funding elsewhere — for only certain North Pacific fisheries, foreign fishing, and limited access privilege programs — suggests that the Fisheries Service can't turn to a catchall "necessary and appropriate" prerogative to implicitly authorize industry funding in the Atlantic herring fishery.[39]

Take for example the provision governing the North Pacific fisheries. The statute says that the relevant council may, in certain North Pacific fisheries, "require[] that observers be stationed on fishing vessels" and "establish[] a system . . . of fees . . . to pay for the cost of implementing the plan."[40]

That provision and the "necessary and appropriate" provisions were enacted at the same time.[41] It is hard to believe that, when Congress decided to *explicitly* allow industry-funding for observers in one way (fees) in one place (the North Pacific), it also decided to *silently* allow all fisheries to fund observers in any other way they choose.[42] The plainer reading

---

"fees paid by limited access privilege holders . . . will cover the costs of management, data collection and analysis, and enforcement activities."

[39] *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("We have long held that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

[40] 16 U.S.C. § 1862(a).

[41] Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448 (codified at 16 U.S.C. § 1853(b)(8)); *id.* § 118(a), 104 Stat. 4457 (codified at 16 U.S.C. § 1862).

[42] *Gross v. FBL Financial Services, Inc*, 557 U.S. 167, 175 (2009) ("negative implications raised by disparate provisions are strongest where the provisions were considered simultaneously" (cleaned up)).

of the text is that Congress's authorization for industry funding was limited to what it expressly authorized.[43]

In its briefing, the Fisheries Service tried to explain away the existence of this specific industry-funding provision by arguing that Congress merely wanted to "mandate" a certain solution in the North Pacific.[44] But that's not what Congress did. The language of the fee provision in the North Pacific is discretionary, not mandatory.[45]

The Fisheries Service also tries to draw a distinction between (1) making fishermen pay for monitors through a "fee" program like the program used in the North Pacific — where the money goes to the government, and the government then uses that money to pay the monitors' wages — and (2) making the fishermen pay the monitors directly, as here, without the government as a middleman.[46]

---

[43] *See NASDAQ Stock Market LLC v. SEC*, No. 21-1167, 2022 WL 2431638, at *6 (D.C. Cir July 5, 2022) (Although our Circuit has, at times, been skeptical of the *expressio unius* canon, when "a grant of authority . . . reasonably impl[ies] the preclusion of alternatives, the canon is a useful aide." (cleaned up)).

[44] Government Brief 44 ("In this situation, 'the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion.'" (quoting *Cheney Railroad Co. v Interstate Commerce Commission*, 902 F.2d 66, 69 (D.C. Cir. 1990))).

[45] 16 U.S.C. § 1862(a)(2) ("The North Pacific council *may* . . . require[] that observers be stationed on fishing vessels" and "establish[] a system . . . of fees . . . to pay for the cost of implementing the plan." (emphasis added)).

[46] The Fisheries Service is not eager to highlight that the North Pacific and limited-access schemes are not at all analogous to the

But if the Fisheries Service is correct that the two schemes *aren't* analogous, that shows the novelty of the Fisheries Service's scheme for the Atlantic herring fishery — a novelty that cuts even more against the Fisheries Service's reliance on an authority either implied or provided by the catch-all "necessary and appropriate" clauses. And on the other hand, if the two schemes *are* analogous, that suggests that Congress made a deliberate choice when it expressly approved fishermen-funded monitoring only for the North Pacific, foreign fishing, and limited access privilege programs — and not here.[47]

---

scheme at issue here in at least one respect: their cost. In the North Pacific, if fees are set as a fixed percentage, they may not exceed two percent of the value of what the ship brings in on a trip. 16 U.S.C. § 1862(b)(2)(E). And in the context of limited access privilege programs, the cap is three percent. *Id.* § 1854(d)(2)(B). But here, the required payments to at-sea monitors could reduce the fishermen's financial returns by twenty percent.

[47] To the extent there is a meaningful difference between paying fees to the government and paying observers directly, the Magnuson-Stevens Act already, explicitly, contemplates both. The Act creates more traditional fee programs in the North Pacific, limited access privilege programs, and foreign fishing generally. But when the Fisheries Service has "insufficient appropriations" to provide full observer coverage for foreign fishing, the Act calls for the implementation of a supplementary observer program under which "certified observers" are "paid by the owners and operators of foreign fishing vessels for observer services." 16 U.S.C. § 1821(h)(6)(C). So we know that Congress is (1) aware of the possibility that appropriations are sometimes insufficient to cover observer programs and (2) capable of creating industry-funding schemes to resolve that dilemma. And the Fisheries Service itself acknowledges both of those points in a document currently posted on its website regarding limited access privilege programs. United States Department of Commerce, National Oceanic and Atmospheric

16

\*     \*     \*

Fishing is a hard way to earn a living.[48] And Congress can make profitable fishing even harder by forcing fishermen to spend a fifth of their revenue on the wages of federal monitors embedded by regulation onto their ships.

But until Congress does that, the Fisheries Service cannot.

I respectfully dissent.

---

Administration & National Marine Fisheries Service, The Design and Use of Limited Access Privilege Programs 3 (Lee G. Anderson & Mark C. Holliday eds., 2007), https://www.fisheries.noaa.gov/resource/document/design-and-use-limited-access-privilege-programs (last updated June 13, 2019) ("In times of constant or shrinking federal budgets, obtaining the funds to pay for new management plans is a real concern. Congress implicitly took this into consideration by mandating a cost recovery program for LAP programs. . . . **Funds to cover the additional costs of the LAP program will have to come from the current appropriations.** This means that there will have to be cuts elsewhere. . . . The [councils'] decisions should ensure that the costs of implementation and operation do not exceed the appropriated and cost-recovered funds available. Regardless of whether it is a LAP program, the alternative is the potential disapproval of a [fishery management plan] (or part of it) where funds are insufficient to carry out a management choice." (emphasis added)).

[48] *Cf.* Ernest Hemingway, The Old Man and the Sea (1952); Herman Melville, Moby Dick (1851); The Perfect Storm (Warner Bros. Pictures 2000); Billy Joel, The Downeaster "Alexa" (1990); *The Deadliest Catch* (Discovery Channel 2005-present); Letter from Vincent Van Gogh to Theo Van Gogh (on or about May 16, 1882), https://vangoghletters.org/vg/letters/let228/letter.html ("The fishermen know that the sea is dangerous and the storm fearsome, but could never see that the dangers were a reason to continue strolling on the beach." (emphasis omitted)).